UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                CASE NO.: 23-20325-CR-Ruiz/Becerra
      Plaintiff,

vs.

WILLIAM POWER McCAUGHAN, JR.

      Defendant.

_____/

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND RENEWED REQUEST FOR A DOWNWARD VARIANCE

The DEFENDANT, WILLIAM POWER McCAUGHAN, JR. (Billy McCaughan), through undersigned counsel, submits the following Memorandum in Aid of Sentencing and hereby renews his request for a sentence of 15 years (downward variance of 8 months).

## I. INTRODUCTION

We would be remiss if we did not acknowledge from the start that Billy McCaughan's conduct was reprehensible, egregious and calls for a significant period of incarceration. Nothing said or argued herein is meant to defend his deplorable actions. A very significant period of incarceration has already been assured by the 15-year mandatory minimum for the production statute chosen by the Government in this case as the offense of conviction.

The Total Offense Level under the Sentencing Guidelines as determined by Probation is 36. Based upon applicable Criminal History Category I, the resulting **advisory guideline range is 188 to 235 months (15.6 to 19.5 years)**. Respectfully, it is submitted that 15 years or more of incarceration, particularly with the mitigation presented, is excessive and not necessary to provide just punishment, protect the public and deter others from committing like offenses. But for the 15-year mandatory minimum, the defense would be requesting a sentence of no more than 10 years based upon the person before the Court and the specific offense conduct in this case:

- **no actual physical contact or attempt to have physical contact with any minor**;
- online chats with teenage boys 14 and 16-17 years old;
- images self-"produced" by teenage boys involving nudity[1] and not sex acts with others;
- no coercive, threatening or manipulative behaviors;

as well as taking into consideration other sentences imposed on similarly situated individuals and those with even more egregious conduct.[2]   But the Government has tied the hands of the Court, choosing to create a floor and eliminating any possibility a sentence of less   15 years may be imposed.

A sentence of more than 15 years imprisonment would be overkill and contrary to the overarching requirement of 18 U.S.C. § 3553 to achieve a sentence that is sufficient, but **no greater than necessary**, to satisfy the purposes of sentencing.  Based on the totality of the facts, coupled with the character letters and, most importantly, the evaluations by two reputable psychologists, Billy is redeemable.  He is intent on finally addressing his emotional and substance abuse issues and he already has begun to make strides in doing so .  Billy still has a long way to go, but he is committed to continuing the road to recovery.  He is also committed to serving his time, making amends and paying it forward.  Billy is not a lost cause and is worthy of a second chance to get things right.  With ongoing sex offender and substance abuse treatment, as well as appropriate restrictions to ensure protection of the public after being released from custody, Billy will once again be a law abiding and productive member of society.

---

[1] The term widely used to refer to photographs of male genitalia taken on mobile devices, "dick pics," has become part of our common lexicon.

[2] We are not trying to insinuate that Billy's conduct does not fall under the purview of the production statute.  However, other individuals engaging in similar or more egregious conduct or taking a more active role in the actual production of the images/videos, including the Texas defendant in the related case discussed in the PSR, have been allowed to plead guilty to other child pornography statutes with lower mandatory minimums, giving the defense in those cases the opportunity to argue for, and the court to consider, lower sentences based upon the specific facts of each case.

## II.  BILLY McCAUGHAN: THE PERSON

Billy McCaughan is a caring, loving and deeply loved son and brother, a valued contributor to every community in which he has lived and worked.  His conduct which brings him before the court for sentencing, while revolting, inexcusable and clearly illegal, also represents a huge deviation from a highly productive, law-abiding life.[3]

### **Personal Background**

Billy is 42 years old and was born and raised in South Florida.  Billy's father, William McCaughan, Sr., is a retired attorney who specialized in real estate litigation.  Billy's mother, Joan, who had been a French teacher before having children, was a stay-at-home mother and focused on raising her children.  Billy is the oldest of four children.  He has a sister who is four years younger, a brother who is six years younger, and a brother who is nine years younger.

Billy grew up in a very conservative Catholic family and attended Catholic schools, including high school (Christopher Columbus) college (Notre Dame) and law school (Georgetown).  He did well academically and was an avid golfer, playing on his high school's golf team.  Upon graduating from law school, Billy worked as a state prosecutor in Southwest Florida. After finishing his two-year commitment in 2009, Billy took a one-year position as a clerk to Hon. Charles R. Wilson, United States Court of Appeals, Eleventh Circuit. In 2010 Billy entered private practice, primarily doing civil litigation.  Over the years, Billy worked for several different firms in Miami.

---

[3] Billy's only prior arrest was in 2008, 15 years ago, in Indiana, during a Notre Dame football game in which his alma mater beat rival Michigan State. According to Billy's younger brother James who attended the game with Billy, despite not showing signs of intoxication, Billy was arrested for public intoxication after trying to come to the aid of a woman who was having trouble with a police officer.  The charge was later dismissed.  We also acknowledge the illegality of Billy's possession of cocaine for personal use, but such use was the result of addiction and substance use disorder which Billy has struggled with for most of his adult life.

**<u>Good Deeds and Community Service</u>**

Throughout his life, Billy has shown kindness to others and volunteered his time and efforts to help those in need.  He is particularly devoted to his family.  He has not just supported his family during times of celebration, such as graduations and weddings, he was always there to help his family when a need arose.  When he was in high school, he took time out of his busy schedule to regularly spend time and golf with his elderly grandparents.  And, later, when they could no longer play golf and became ill, Billy helped take care of his grandparents until their deaths.  Billy was also at his mother's side during an arduous course of treatment for cancer several years ago, giving her assistance and emotional support.

Billy has done considerable charitable volunteer work from a young age.  He accompanied his parents as a teen when they volunteered at Boys Town Miami (now known as Catholic Charities) and with Christmas in April, a group dedicated to refurbishing the homes of low-income people that have fallen into disrepair.  As an adult, Billy volunteered with Habitat for Humanity in both Tampa and Miami, helping conduct interviews and build homes.  Billy served as the President of the Notre Dame Miami Alumni Club for many years, coordinating social and charitable events and regularly assisting other alumni in their relocation to the Miami area.  In 2015, Billy began serving on the Young Leaders Board of Camillus House, an organization that assists and provides services to the homeless.  Billy assisted homeless individuals with studying for the GED and preparing resumes.  The last time he volunteered his time in connection with the Young Leaders Board was approximately two weeks before his arrest in July 2023.  Billy has also done pro bono work as an attorney.

**<u>Difficulties Accepting Sexual Orientation</u>**

Given his conservative Catholic upbringing and education, as a teenager and young adult, Billy repressed his sexual orientation.  He felt confused and uncomfortable in his own skin and

could not even admit he was attracted to men.  He viewed naked pictures of men on Craig's List, but feeling frightened and ashamed, Billy suppressed his feelings and did not pursue relationships with men.  When Billy was 29 or 30 years old, he understood that he might be gay, but tried to convince himself that he was just experimenting.  When he was 31, Billy accepted that he was gay and started coming out.  Coming out to his parents was extremely difficult for Billy as his parents, particularly his mother, initially struggled with the revelation that their son was gay.  Being gay in a conservative Catholic family wreaked havoc on Billy's psyche, fostering feelings of inadequacy and isolation.  Even though his family eventually came to terms with the fact that he was gay and made efforts to show their acceptance and support, Billy had difficulty overcoming feeling hurt and rejected.

Although Billy remained close and spent time with his family members, he still felt lonely.  Seeing all his siblings get married and have children, Billy yearned to have a close, serious and committed relationship and to get married and have his own family.  His longest relationship lasted less than a year and ended when his partner did not want to be monogamous.  Billy craved connection and acceptance.

## Substance Use Disorder

Billy tried to numb his feelings of low self-esteem and loneliness with drugs and alcohol.  In 2017, Billy spent eight months binging on cocaine and alcohol, resulting in him being fired from his job.  During this period, Billy's father reached out to try to help him, but Billy refused.  Finally, in November 2017, Billy entered an intensive 28-day substance abuse program.  In 2018, after completing the treatment program, Billy went back to practicing law with a different firm and tried to stay sober.

Billy continued to feel inadequate and alone.  He constantly feared rejection.  Feelings of isolation crept back in, and in 2019 Billy began abusing drugs and alcohol once again.  Although

he was able to work during the day, he spent nights and his free time drunk and high on cocaine. Searching to connect with others, he turned to online chatrooms, going down the rabbit hole. Then, in 2020, with the onset of the pandemic, the isolation Billy was feeling became an overwhelming reality, leading to increased alcohol and drug use and increased online activities, leading to his arrest in July 2023.

### Letters of Support

Billy's family members, friends and colleagues, knowing Billy's true character and many exceptional qualities, are standing by Billy and have provided letters of support, which are attached as **Composite Exhibit A**. These letters provide a snapshot of who Billy really is when he is sober and spending time with his family and friends and working as a lawyer.

Despite the nature of the charges pending against him, Billy still has tremendous support from his family. During his more than one year of pre-trial detention, his parents have had regular contact, speaking on the phone frequently and one or both visiting Billy on at least a weekly basis. Billy's parents are understandably heartbroken about the entire situation, not just that Billy was arrested and is facing a lengthy prison sentence, but over Billy's conduct. But their love for their son has not abated, and they are committed to supporting Billy through his period of incarceration and God willing, after, when Billy ultimately is released. Letter from Billy's father (Bill, Sr.) and his mother (Joan) is attached as Exhibit A(1).

Billy's bother, James,[4] in his letter attached as Exhibit A(2), provides the following insights regarding his brother:

> "One of my best memories of Billy is from my wedding. He gave a best man speech during the reception, and aside from the fact that he left the crowd in stitches, he had incredibly kind, inspiring words for me, for my wife, and I would like to think for the whole audience. This was Billy at his best - no drugs, no drinking, and putting forward his true, selfless soul.

---

[4] James, like his father and brother Billy, is an attorney, although he is no longer practicing.

I was also recently reminded of another incident demonstrating Billy's selflessness … When I was in college (Billy and I both went to the same school), Billy came back to visit for a football game. During the game, Billy noticed a woman apparently having some trouble with the police. Billy, maybe unwisely but undoubtedly putting someone else's best interest in front of his own, tried to step in to assist the woman. At that point, the police turned their attention to Billy and decided to arrest him, ultimately citing him for public intoxication. This only occurred because Billy was willing to stick his neck out for someone else. (Also, Billy was not showing any signs of intoxication.)"

Colleen, Billy's sister, who lives with her family in England, has also spoken to Billy regularly since his arrest.  In Colleen's letter attached as Exhibit A(3), she provides the following insights about her brother Billy:

"I always thought Billy had a larger than normal capacity to love and support his friends and family through the good times and the bad. I just wish he took some of that capacity to love and saved it for himself. The Billy I know now is remorseful. I speak with him on a more regular basis now than I have in over a decade, if not ever, and I have recognised a positive shift in his demeanour. Some might say that would be obvious given his current circumstances, but Billy is taking this time to reflect on how he wants to reshape his life and focus on living and contributing to a world without being under the influence of drug and alcohol. Billy told me recently that he felt he wouldn't have been around much longer if he kept on the path he was going, so damaging was his abuse of drug and alcohol."

Although Colleen is unable to travel to Miami, she plans to attend the sentencing hearing via Zoom to show her continuing support for her brother Billy.

Billy's friends have also shown their support and provided letters giving further insights regarding Billy's true character and values.  Frederick Hasty, Billy's longest and closest friend who is a medical doctor and attended school with Billy from elementary school to high school and then college at Notre Dame, will be speaking on behalf of Billy at the sentencing hearing and has also provided critical observations and perspective to help us understand Billy's struggles since childhood:

"Many will say Billy's demon is cocaine. It's not. It's one of the ways Billy uses to try to chase away his demon, along with alcohol and pornography. His demon is the profound pain of loneliness and isolation. There has never been any point in Billy's entire life, not in grade school, high school, at Notre Dame, in law school at Georgetown or at his initially big shot law firm, when Billy ever felt truly accepted.

> Billy was picked on since the first day he showed up to school, bullied, beaten and altogether made to feel like an outsider at every turn in elementary and high school and all that was before he told anyone he was gay. At Notre Dame Billy did his best to fit in but it never seemed to work. That's when the drinking ramped up. It was an instant fix, and an addict was made. Since his first year in college Billy has been in a life and death struggle with substances to help him escape his pain…These acts, these texts, they aren't Billy. He's no pedophile. I am a medical doctor, not a psychiatrist so I cannot with any certainty explain the extremely serious criminal conduct outlined in the Complaint. I do wonder if this was another destructive way in which Billy was trying to escape his demon."

Dr. Frederick Hasty Letter attached as Exhibit A(4).

Yvonne Johnson Philips, M.D., has known Billy for more than a decade and has offered to speak on his behalf at the sentencing hearing.  She first met Billy when he was the president of the Notre Dame Alumni Club of Miami and she was the mother of a Notre Dame freshman.  Dr. Johnson has provided us with details regarding Billy's kindness and efforts to make her family feel welcome and accepted:

> "My late husband who suffered from an early onset dementia at the time and our adult son with developmental disabilities attended [a Notre Dame football gamewatch] with me. It was not uncommon for strangers to be uncomfortable around us. We were greeted by Billy who went out of his way to make sure that we were introduced to other attendees (most of whom knew each other) and felt welcomed and included. Billy continued to welcome us in the same kind and inclusive manner throughout our first season as Notre Dame Club members. In fact, we felt so welcomed by Billy that our son began bringing some of his Special Olympics teammates to the gamewatches. Thanks to Billy's welcoming and inclusive manner our group became regular and accepted members of the Notre Dame Alumni family."

Dr. Johnson Letter attached as Exhibit A(5).  Over the years, Billy stayed in close contact with Dr. Johnson and shared his struggles with alcohol: "Billy had the honesty and trust to share with me that he struggled with alcohol use disorder and was accepting treatment to maintain sobriety. Without this admission, I would have had no reason to be aware of his challenges. I was not aware until recently that he relapsed and that his substance use included other drugs. Perhaps the influence of the substances accounts for behavior so antithetical to the person I have known Billy to be."

Also being provided are letters from Billy's aunts, cousins and various family friends, most who have known Billy his entire life. Attached as Exhibit A(6) - A(17). Billy has an exceptional support system. Despite the nature of the charges, Billy has experienced an absolute outpouring of support from friends. It is one thing to get family and some friends to say that a defendant is a good guy. Much more meaningful are the repeated expressions from people that, even knowing the crime he committed, they support him and will continue to support him upon his release.

### III.  OFFENSE CONDUCT

Fueled with mind-altering substances and lack of sleep, Billy became a different person online. He invented an online persona and believed that those with whom he was communicating had done the same thing. Billy convinced himself that the online chats were fantasy. He failed to comprehend how his actions were harmful to the children involved in the images he received and the teenagers he conversed with and received images from online. As opined by Dr. William R. Samek (evaluations and reports discussed below), Billy's "daily drug and alcohol use contributed significantly to his irrational thinking (really not thinking) and to his poor self-control related to his misuse of computer chat lines." Samek Initial Report, p. 4.

We agree that Billy's online chats are abhorrent, vile and extremely disturbing. He verbalized sexual activities he claimed to have engaged in with minors. Many of his claims were demonstrably and undeniably false, such as his repeated claims that he was engaging in sexual acts with his "daughters" when he, in fact, has no daughters. Like other individuals with whom Billy chatted online, he also verbalized sexual scenarios he claimed to want to engage in with minors. But, in Billy's mind, in a haze of alcohol and cocaine, he considered what the others told him and what he wrote to them as pure fantasy. In sentencing Billy, we ask this Court to focus on Billy's actual criminal conduct and not the words he wrote about things which indisputably never happened or for which, as the Government has confirmed, there is no evidence.

Billy's criminal conduct is primarily comprised of requesting and receiving images for his own viewing which he later deleted.  Billy's requests for "production" of images were mainly for "dick pics" from teenage chat participants.  Billy did not seek out minors on commonly used social media apps like TikTok, Instagram, Snapchat or Discord.  Not to fault the involved teens, but to distinguish Billy's conduct from other offenders, the teens were using online platforms known for explicit content.  And, to be clear, such "chats" were words typed and displayed on a screen and not voice communications or live video chats.   Most significant, Billy never had, nor did he make any effort to have, any physical contact with any of the minors involved in the chats.  There is also no evidence that Billy ever distributed any of the images or videos he received, including the images self-"produced" by the teenagers he chatted with online and the video of the 11-year-old exiting the shower naked sent to him by the individual in Texas.

Yes, Billy's actions were reckless, reprehensible and criminal.  But, as opined by Dr. Samek, Billy never intended to follow through and do the awful and disturbing things he talked about in the chatrooms.

## IV.  PSYCHO-SEXUAL EVALUATIONS AND OPINIONS

### *William R. Samek, Ph.D.*

Psycho-sexual examinations and evaluations have been conducted by Dr. William R. Samek, Ph.D., a clinical and forensic psychologist with over forty-five (45) years of professional experience working with sex offenders, their families, and their victims, who has been qualified as a Mentally Disordered Sex Offender (MDSO) expert, and approved as an MDSO Treatment Provider by the Florida Department of Corrections, Probation and Parole.

Dr. Samek conducted his initial evaluation and prepared his initial Report after conducting extended in-person interviews, visiting Billy at FDC on three separate occasions for a total of nine (9) hours. Dr. Samek also reviewed the Criminal Complaint, FBI Special Agent Augustyniak's

Affidavit and copies of the online chats produced to the defense in discovery which formed the

basis for the additional counts added in the Superseding Indictment, including production charges.

Dr. Samek's initial Psycho-Sexual Evaluation Report (Samek Initial Report), dated November 30,

2023, will be provided separately under seal to the Court.

> According to Dr. Samek's professional opinion:

> Mr. McCaughan, Jr. suffers from a mental abnormality or personality disorder. His
> primary illness is substance abuse, cocaine and alcohol. He uses these to not feel
> his feelings of resentment and isolation. Connected to this is his early and strong
> suppression and repression of his sexual orientation and his related sexual feelings.

Samek Initial Report, p. 10.

> Mr. McCaughan, Jr. was largely motivated by his out-of-control, long-term drug
> abuse, his social isolation, loneliness, resentment, desire to find friends, sexual
> frustrations from difficulty finding a healthy gay relationship, rigid moral Catholic
> upbringing, and other factors. I think that his sexual chats on the internet were an
> outlet for his drug enhanced and disinhibited sexual fantasies and resentments and
> not an attempt to groom or actually molest a child… based on the available chats
> and other information, it appears unlikely that he would ever have hands-on
> molested a child.

Samek Initial Report, p. 8.  Regarding potential risk to the community, Dr. Samek opined that,

"[i]f Mr. McCaughan, Jr. is monitored to make sure that he has ongoing psychotherapy and to

prevent his use of any alcohol or cocaine, the risk of his actively harming children is low." Samek

Initial Report, p. 10.

In anticipation of the upcoming sentencing hearing, the defense asked Dr. Samek to

conduct a follow-up evaluation.  Dr. Samek visited Billy a fourth time on Monday, August 20,

2024, spending an additional three (3) hours interviewing Billy, bringing the total of in-person

time with Billy to twelve (12) hours.   Dr. Samek's Addendum-Update to Psycho-Sexual

Evaluation Report (Samek Update Report), dated August 23, 2024, will be provided separately

under seal to the Court.  Dr. Samek "continue[s] to believe that the facts and opinions stated [in

his Initial Report] were correct."  Samek Update Report, p. 1.  In addition, Dr. Samek reported, in

pertinent part, as follows:

> **CHANGES IN HIS PSCYHOLOGICAL CONDITION:** In the past year Mr. McCaughan, Jr's. mental state has considerably improved. His thinking has significantly improved due to his being drug and alcohol free for a year now. Also, he has spent considerable time thinking about himself and others and what he has done…
>
> **CURRENT MENTAL STATUS:** Mr. McCaughan, Jr's. Mental Status is as stated in my prior report except that now he appeared less defensive and much more able to look at and talk about himself and his family problems in an open and realistic manner. He clearly appreciates the wrongfulness of his past behaviors including his drug abuse and his resulting sexual internet behavior. He also appears to be less lonely as he is developing healthy connections, with appropriate boundaries, to some of the other detainees…
>
> **UPDATED DIAGNOSTIC IMPRESSION:** Homosexual and Relationship Related Distress (F65.9) with shame, hurt, and mostly unconscious passive-aggressive anger; self "medicated" with alcohol and cocaine. Also, long term, daily Substance Use Disorders: Alcohol (F10.20) and Cocaine (F14.20) in solid remission in a controlled environment, without perceptual disturbances.
>
> **Risk to the community**. If Mr. McCaughan, Jr. is monitored to make sure that he has ongoing psychotherapy and to prevent a relapse with alcohol or cocaine, his risk of reoffending is low.

Samek Update Report, p. 2.

### *Michael P. Brannon, Psy.D.*

An additional evaluation and risk assessment was conducted by Michael P. Brannon, Psy.D., a licensed forensic psychologist who focuses on conducting state of the art forensic assessments in criminal, civil, and family law cases, including cases involving substance abuse, sexual offenders and risk assessment.  Dr. Brannon conducted an actuarial assessment utilizing the STATIC-99R, an actuarial instrument developed for assessing the potential risk of future sexual offending behavior for an identified offender, and the STABLE 2007 is an actuarial instrument developed for assessing dynamic (subject to change) factors associated with future sex-offending behavior for an identified offender.  Dr. Brannon's Report (Brannon Report), dated April 22, 2024,

will be provided separately under seal to the Court.  Based upon the testing conducted, Dr. Brannon

made the following findings:

> **Conclusions:** The examinee's score of 3 on the STATIC-99R is in the comparison
> group classified as the Average risk range. Individuals in the standardization
> sample who obtained the same score as the examinee sexually reoffended at a rate
> of 6.5% over 5 years and 10.1% over 10 years. The examinee's score of 6 on the
> STABLE 2007 places him in the Low risk range for sexual reoffending in the
> foreseeable future.

Brannon Report, p. 7.

### *FBI Behavioral Analysis Unit 3 (BAU-3) Criminal Investigative Analysis*

On August 20, 2024, the Government provided the defense with a "Criminal Investigative

Analysis" report (FBI Report), dated August 7, 2024, which was prepared by a Supervisory Special

Agent (SSA) of the FBI's Behavioral Analysis Unit 3 (BAU-3), National Center for the Analysis

of Violent Crime (NCAVC), which discusses areas of concern and risk factors for reoffending.  It

is anticipated that the Government will be seeking to utilize the FBI Report at the upcoming

sentencing hearing.  Significantly, the FBI Report acknowledged that their limited analysis, which

is based only on review of case materials and other information submitted by the FBI's Miami

field office and without interviewing Billy, "**is neither a psychological assessment nor a forensic**

**psychological evaluation of William McCaughan**."

We have been unable to find any reported case in which a similar report prepared by BAU-

3 utilizing criminal investigative analysis methodology to identify risk factors has been admitted

or excluded in the sentencing context.[5]  The only case located discussing whether similar evidence

in the form of testimony from an FBI BAU agent was admissible and should be considered by the

court regarding risk of reoffending involved the issue of pre-trial detention.  In that case, *United*

---

[5] Some courts have allowed expert testimony at trial or in support of search warrants of FBI agents from BAU-3 regarding grooming or other behaviors of sexual predators.  See, e.g., *United States v. Romero*, 189 F.3d 576 (7th Cir. 1999); *United States v. Halamek*, 5 F.4th 1081 (9th Cir 2021).

*States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 (D. Md. Jan. 13, 2006), where

the defendant was charged with sexual exploitation of a child and the receipt and possession of

child pornography, each side presented the testimony of a single expert witness to assist the court

in determining the level of risk posed by the defendant if released pending trial.  The defendant

presented the testimony of a doctor board-certified in psychiatry and forensic psychiatry with

extensive professional experience and academic credentials who conducted a forensic psychiatric

evaluation of the defendant for over five hours.  The government presented the testimony of a

supervisory special agent with the FBI's Behavioral Analysis Unit (BAU), who was offered as an

expert in "criminal investigative analysis" in light of his training and experience in investigating

child sex offenders and their characteristics and methods.  Using a *Daubert*[6] analysis, the district

court compared and assessed the reliability of the expert testimony presented.  Finding the

psychiatrist's testimony to be reliable, the court noted that:

> the factors used by this Court to assess the reliability of [psychiatrist]'s opinion,
> which he was clearly qualified to render, have also been applied by the Fourth
> Circuit in evaluating the reliability of a forensic psychologist's opinion regarding a
> defendant's future dangerousness.

*Id.* at 63, citing *United States v. Barnette*, 211 F.3d 803, 816 (4th Cir. 2000).  The court, however,

determined that the FBI BAU agent's opinion testimony on future dangerousness lacked reliability

because the agent was unable to demonstrate that the methodology of the "criminal investigative

analysis" utilized had been subject to testing, validation, and meaningful peer review analysis.

The FBI Report was provided to Dr. Samek for his review and his analysis thereof is

included in his Update Report.  According to Dr. Samek,

> [The] research studies [relied upon] did not take into consideration the effect of
> significant moderating and relevant co-existing variables that likely modify the
> meaning and results of the studies. Specifically, the studies do not control for the
> independent variable of addiction and extreme intoxication while offending. They

---

[6] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 593-94, 597, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993)

do not look at how the risks of reoffending are moderated by and changed when an individual who offended while intoxicated no longer gets high with drugs or alcohol…

The Government goes on the argue that Mr. McCaughan, Jr. has an Antisocial Orientation based on statements against self-interest that Mr. McCaughan, Jr. made to Dr. Brannon and myself. The Government uses his admissions as evidence that Mr. McCaughan, Jr. has antisocial tendencies. In fact, it is just the opposite. His admissions and honesty in this context are evidence of his pro-social tendencies and traits. An Antisocial Personality would simply deny, deny, deny. Admitting to things that are against self-interest and otherwise undiscoverable by the Government is evidence of a mix of both pro-social personality traits and of self-destructive self-directed anger…

I agree with the Government's statement on the top of page 17, "The investigative materials provided for review did not reveal any substantive information concerning McCaughan's emotional congruence with children." They are saying here that there is no evidence that Mr. McCaughan, Jr. likes, connects with, or has any real interest in children. He was a troubled gay man, not a pedophile.

Samek Update Report, p. 2-4.

Given the questionable reliability of the methodology utilized by the FBI in conducting its "criminal investigative analysis" to identify potential risk factors in this case, we ask the Court to give little, if any, weight to the opinions and conclusions in the FBI Report regarding Billy's risk of reoffending.

## V.  REMORSE AND REHABILITATION

Now fully sober for the first time in many years, living in a federal detention center, realizing and accepting full responsibility for the danger to innocent children his crimes presented and the incredible pain and suffering he has caused and continues to cause his parents, his siblings and his extended family, Billy has demonstrated appreciation for the wrongfulness of his conduct. Billy has also demonstrated a commitment to figure out what led him to engage in such conduct and, most important, prevent it from ever occurring again.  Billy has already exhibited success in trying to address his substance abuse and mental health conditions.  As opined by Dr. Samek, Billy

is amenable to treatment and with such treatment and recommended restrictions is a low risk of reoffending.

### VI. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

The "need to avoid unwarranted sentencing disparities" is a factor required to be taken into consideration in determining an appropriate sentence.  18 U.S.C. §3553(a)(6).  Billy is at the low end of the spectrum of culpability for a production offense.  Based upon the sentences imposed on similarly situated individuals and those who have committed more egregious conduct, a sentence of no more than the 15-year minimum is necessary to prevent an unwarranted sentencing disparity.

### Related Case – Northern District of Texas

An individual in a related case (C.L.), discussed in the Criminal Complaint and Presentence Investigation Report (¶¶20-30) in Billy's case, was charged separately in the Northern District of Texas and has already been sentenced.  C.L. was arrested after he distributed several sexually explicit images and videos depicting prepubescent minors to an undercover officer.  After his arrest, C.L. admitted that one of the videos he had sent to the undercover officer and also sent to Billy, showing a fully-nude young girl exiting a shower, depicted his own 11-year-old niece and was personally created by C.L by putting a hidden camera inside the bathroom without her knowledge.  C.L. later edited the video to make his niece's pubic area the focal point of the video.

C.L. was charged with six counts of possession of child pornography, which were later dismissed, and one count of distribution (18 U.S.C. § 2252A), to which he pled guilty pursuant to a plea agreement.  Despite his admissions regarding his personal production of the video of his niece, C.L. was never charged with production and allowed to plead guilty to a single count of distribution with a *five-year minimum* and 20 year maximum.  At sentencing, the court found that C.L.'s offense level and guidelines range should be determined under the production guideline, U.S.S.G. § 2G2.1, instead of the distribution guideline, U.S.S.G. § 2G2.2.  With a guideline total

offense level of 37 (1 level more than Billy), C.L.'s guideline range was 210 to 240 months (the statutory maximum).  On September 23, 2023, the Court sentenced C.L. to 220 months (18.3 years) and 25 years of supervised release.

### Examples of Southern District of Florida Sentences

### *United States v. Rene Pedrosa*, 21-cr-20259-SCOLA:

The Defendant, who was 48 years old and employed as an aide for the Mayor of the City of Miami, contacted a 16-year-old boy via Instagram about a possible website design job for the Mayor.  A few weeks later, the defendant met the victim at a café to discuss the website job.  The victim's mother accompanied her son to the meeting and, when she apologized for being present, the defendant, trying to make her feel comfortable, told her that he and his wife were also overly protective of their son (he did not have a wife or a son).  A follow-up meeting at City Hall was scheduled and the defendant told the victim that they would be meeting with the Mayor to discuss the website job.

The victim's mother drove her son to the follow-up meeting but was not present during the meeting.  The defendant took the victim to a conference room in City Hall, where he proceeded to touch the Victim's penis over his clothing multiple times, grabbed his buttocks, kissed the victim, and placed the victim's hand over the defendant's clothed erect penis.  The victim rejected the defendant's advances and left City Hall. After the meeting, the defendant continued to communicate with the victim via an internet-based messaging application and discussed wanting to engage in sexual activities.  On one occasion, after the victim informed the defendant that he was showering, the defendant requested and received an image and a video of the victim engaged in sexually explicit conduct.

The defendant was charged with attempted coercion and enticement of a minor to engage in sexual activity, completed coercion and enticement of a minor to engage in sexual activity,

production of child pornography, receipt of child pornography, and attempted possession of child pornography.  Pursuant to a plea agreement, the defendant plead guilty to one count of receipt of child pornography (5-year minimum mandatory and 20 year maximum) and the Government agreed to dismiss all remaining counts, including production of child pornography.  However, at sentencing, the Government argued and the Court agreed that, based on the undisputed facts, the production guideline, 2G2.1, applied.  The defendant's total offense level was determined to be 35 with an applicable guideline range of 168 to 210 months.[7]

At the sentencing hearing held on August 14, 2023, in making its sentencing recommendation, the Government made the following argument:

> This is a man who used his position as the mayor's communications director to sexually exploit a 16-year-old boy… he reached out to the minor on Instagram…At the time that he reached out to the minor, he had, for at least several years on repeated basis, searched out pornographic images of young boys…He knew who he was reaching out to, and he was doing that for a predatory purpose…The **defendant and people like the defendant who hold positions of power and trust in the community are the most dangerous types of offenders in our community** because parents readily allow them to have access to their children because they have a presumption, or a cloak, of trust worthiness, honesty, safety. And the **defendant played on that for his own perverted purpose**. And when you read the messages, you see that in one breath, he's talking to the minor about something sexually explicit, and in the next, he's saying, oh, but I really respect your work and I want to help you. So this whole case is about **somebody who is in a position of trust and power who used that position to gain access to a minor and sexually exploit him… He produced child pornography. He enticed the minor to come to his house to do sexual things. He molested him. He committed a hands-on offense**.

Transcript of Sentencing Hearing, p. 16-19 (emphasis added).  The sentence the Government requested was 180 months – **15 years, one year more than the bottom of the Guidelines**.  The

---

[7] Probation initially recommended a five level enhancement for pattern pursuant to 4B1.5(b), but after the defendant objected because the offense of conviction (receipt) is specifically excluded from "covered sex crimes" under 4B1.5, the enhancement was not applied.  It is believed that, had Mr. Pedrosa been required to plead guilty to production, the enhancement would have been applied and his resulting total offense level would have been 40, with a guideline range of 292 to 365 months.  This point is being made so that a fair comparison to Billy's case can be made.

Court, granting a variance, sentenced the defendant to 72 months – 6 years, with 15 years of supervised release.

### *United States v. Jeffrey Holcombe*, 21-cr-20261-RAR:

Over the course of several months, the defendant engaged in online chats on Kik App with a 13 year old female.  At the defendant's request, the victim sent him 10 videos and 50 images of herself engaged in sexually explicit activities (some showing her face).  When she told him she did not want to send any more images or videos, he told her "you belong to me" and threatened her that if she did not continue to send images and videos, he would sell her images online, make posters of her images and post them around the neighborhood where she lived, and would come find her and her family.

After making the threats, the defendant directed the victim to record more videos including directing her to record a video of herself inserting a hairbrush into her rectum.  She initially complied, but later reported him to the police.  An undercover agent posed as the victim and had ongoing conversations with the defendant, during which he admitted his conduct and continued making threats.  Pursuant to a Plea Agreement, he plead guilty to one count of production, with the Government agreeing to recommend a guideline sentence.  With a Total Offense level 39, the guideline range was 262-360 months.  The Government requested a middle of the guideline range sentence – 294 months (24.5 years).  On January 12, 2022, this Court, granting a variance, sentenced the defendant to 230 months (19.16 years).

Additional cases and sentences imposed by this Court for defendants who engaged in production conduct are set forth and summarized in the Chart attached as **Exhibit B**.

### United States Sentencing Commission Data (2019-2023)

"Information from the United States Sentencing Commission, Judiciary Sentencing Information tool reflects during the last five fiscal years (FY2019-2023), there were 30 defendants

(1) whose primary guideline was §2G2.1, with a Final Offense Level of 36 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 30 defendants (100%) who received a sentence of imprisonment in whole or in part, the **average length of imprisonment imposed was 167 months [13.9 years] and the median length of imprisonment imposed was 180 months [15 years]**." Addendum to the Presentence Report, p. 3 (emphasis added).

## VII.  PROPOSED SENTENCE AND SATISFACTION OF THE PURPOSES OF SENTENCING

In determining an appropriate sentence, it is respectfully submitted that the Court must apply the overriding principle and basic mandate of § 3553(a) to impose a sentence "*sufficient, but not greater than necessary*," to comply with the four purposes of sentencing set forth in Section 3553(a)(2):

> the need for the sentence imposed – A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; B) to afford adequate deterrence to criminal conduct; C) to protect the public from further crimes of the defendant; and D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The offense conduct which Billy has admitted, simply put, is deplorable.  There is no disputing his guilt.  Any fair and rational person would be concerned about making sure the public is protected from future, similar conduct by Billy.

On the other side of the coin, it is beyond cavil Billy has an exceptional support system. He knows he has to re-prove himself as a son, brother, friend and as a member of the community. Billy is motivated and committed to making amends for his crimes, living up to the values his parents taught him.  Billy's remorse for his inexcusable conduct is profound and sincere.  Billy knows he has work to do to accomplish that.

With the extraordinary love and support of his family and friends, Billy will be able to succeed in his treatment and continuing rehabilitation. Billy will be in his late 50s when he is released from prison, further reducing the likelihood of recidivism. A sentence of 15 years adequately protects the community and sends a powerful message about the penalty for such a crime. And, as for Billy, who has never before spent time in prison, such a sentence is more than ample punishment and one that will certainly deter him from any such future wrongful and illegal conduct.

Warehousing Billy for close to two decades as the Government is requesting is excessive and serves no valid purpose. Therefore, in closing, on behalf of Billy, his father, Bill, his mother, Joan, his siblings, extended family and friends, we urge this Court to recognize all of the circumstances discussed herein, not just the crime, and determine a prison sentence that is "not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a)(2).

Based on the nature and circumstances of the charged offense, and the history and characteristics of the individual before the Court, including Billy's remorse, his prospects for rehabilitation, amenability to treatment and extraordinary family support, we respectfully submit that the following proposed sentence is "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2):

1.    Fifteen (15) years in prison;

2.    Ten (10) years on supervised release, with the following special conditions:

     a.    continued sex offender and substance abuse treatment;
     b.    no unsupervised contact with minors;
     c.    no computer and modem access except for approved work purposes;
     d.    polygraph examinations;
     e.    installation of computer monitoring software.

WHEREFORE, the Defendant, WILLIAM POWER McCAUGHAN, JR., respectfully requests that this Court take into consideration the foregoing in determining an appropriate sentence in this matter.

Respectfully submitted,

**ROTHMAN & ASSOCIATES, P.A.**
200 S. Biscayne Blvd.; Suite 2770
Miami, FL 33131
Telephone (305) 358-9000
By:/s/ *David B. Rothman*
     David B. Rothman
     Florida Bar No. 240273
     Email: dbr@rothmanlawyers.com
By:/s/ *Jeanne T. Melendez*
     Jeanne T. Melendez
     Florida Bar No. 0027571
     Email: jtm@rothmanlawyers.com

**ROSENBAUM & ACEVEDO, L.L.P.**
100 SE 2nd Street, Suite 3400
Miami, Florida 33131
Telephone (305) 446-6099
By:/s/ *Joseph S. Rosenbaum*
     Joseph S. Rosenbaum
     Florida Bar No.: 240206
     Email: ka@rosenbaumacevedolaw.com

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on the 26th day of August 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, I also certify that the foregoing document is being served this day on the following parties via transmissions of Notices of Electronic Filing generated by CM/ECF or email:

AUSA Abbie Waxman
United States Attorney's Office
99 N.E. 4th Street
Miami, FL 33132-2111
Abbie.waxman@usdoj.gov

Danielle Sylvester-Pierre
Sentencing Guideline Specialist
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue, 9th Floor South
Miami, FL 33128
Danielle_Sylvester-Pierre@flsp.uscourts.gov

       By:/s/ *Jeanne T. Melendez*
          Jeanne T. Melendez
          Florida Bar No. 0027571